UNITED STATE BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:   DAVID BEEBE,                                                                 Case No. 15-10909-j7

      Debtor.

NEW MEXICO DEPARTMENT OF
WORKFORCE SOLUTIONS,

      Plaintiff,

v.                                                                                              Adv. No. 15-01054-j

DAVID BEEBE,

      Debtor.

## MEMORANDUM OPINION

Plaintiff, New Mexico Department of Workforce Solutions (the "Department"), objects to the dischargeability of debt pursuant to 11 U.S.C. §§ 523(a)(2)(A). The Department claims that the defendant/debtor, David Beebe ("Debtor"), willfully misrepresented his employment status to obtain unemployment benefits he was not entitled to receive. After consideration of the evidence admitted at trial, arguments of the Debtor and counsel for the Department, and applicable law, the Court finds and concludes that Debtor's $15,584.93 debt to the Department is non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A).

I. **Procedural History.**

On April 9, 2015, Debtor filed his voluntary petition for relief under Chapter 7 of the Bankruptcy Code. *See* Bankruptcy Case No. 15-10909-j7, Docket No. 1. On July 10, 2015, the Department initiated this adversary proceeding by filing its Complaint to Determine Dischargeability of Debt (the "Complaint"). *See* Docket No. 1. Debtor timely filed an answer to the Complaint. *See* Docket No. 4. On July 29, 2015, the Court entered an order granting Debtor

a discharge under 11 U.S.C. § 727. *See* Bankruptcy Case No. 15-10909-j7, Docket No. 21. The same day, Debtor's bankruptcy case was closed, leaving this adversary proceeding as the lone pending matter associated with the bankruptcy case.

## II.     Findings of Fact.

In accordance with Fed. R. Civ. P 52(a)(1), made applicable by Fed. R. Bankr. P. 9014, the Court finds the following facts:

### A.     *The Department.*

The Department is the administrator of the New Mexico's unemployment insurance compensation system. *See* N.M.S.A. 1978 § 51-1-2. The Department receives and processes claims for unemployment insurance benefits.[1] The Department receives funds for the administration of New Mexico unemployment insurance compensation system from employer payroll taxes. The Department separately maintains an additional fund with funds received from the United States Department of Labor, which the Department uses to provide extended benefits to claimants who are no longer eligible to receive standard benefits. In processing claims for unemployment insurance benefits, the Department screens the claimants for monetary eligibility and non-monetary eligibility.

Whether filing online or by telephone, a claimant is presented with an Eligibility Benefit Rights Information Statement (the "EBRI Statement"). *See* Department's Exhibit 4. Claimants must acknowledge that they understand the EBRI Statement before proceeding with their claim. The EBRI Statement provides, in part, as follows: "Total gross wages (before taxes) must be

---

[1] The Department reviews the claims and is charged with determining the claimants' monetary and non-monetary eligibility to receive unemployment insurance benefits based upon the statutory criteria. A claimant is monetarily eligible for unemployment insurance benefits where he/she has worked for wages in at least two of the last six quarters prior to filing a claim. See N.M.S.A. 1978 § 51-1-5(A)(5). A claimant's non-monetary edibility is based on a variety of factors including current employment status. See generally N.M.S.A. 1978 § 51-1-5.

- 2 -

Case 15-01054-j    Doc 25    Filed 09/14/16    Entered 09/14/16 11:10:32 Page 2 of 17

reported for any work you perform during each week as you work for the money not as you get paid. You will report these GROSS wages each week that you certify your weekly claim for benefits." Department's Exhibit 4. For each week a claimant requests benefits, the claimant files with the Department, either online or by telephone, a certification responding to twelve questions. The Department uses the claimant's weekly certifications to determine the claimant's non-monetary eligibility for benefits for that week. The sixth question on the weekly certification is: "Did you work for cash, wages, or anything of value during this week?" Department's Exhibit 7. If the claimant responds "yes" to the sixth question, the claimant is asked to provide the gross wages earned during that week, the name of their employer, whether the claimant is still working for that employer, the reason for separation from that employer, whether the claimant was fired or quit, and whether the claimant's earrings that week were from military duty. *See id.*

### B. *Debtor's claim for unemployment insurance benefits.*

On March 21, 2010, Debtor filed an Unemployment Insurance Claim for Benefits (the "First Application") with the Department. *See* Department's Exhibit 5. In the First Application, Debtor represented that he had worked for Fidelity Employer Services LLC from January 29, 2009 through March 26, 2010; Celico Partnership from September 1, 2008 through January 1, 2009; and Sprint/United Management Co from April 1, 2007 through May 1, 2008. Debtor further represented that he was not then "able and available to accept permanent full-time or part-time work" because of transportation and other problems. *See id.* Debtor represented that he worked for $503.20 in wages the week he completed the First Application. *See id.*

Two weeks after submitting the First Application, Debtor submitted his first weekly certification. *See id.* Debtor certified that he earned no wages for this week and received benefits of $291.00. *See* Department's Exhibit 6. With four exceptions, Debtor made weekly certifications

- 3 -

Case 15-01054-j    Doc 25    Filed 09/14/16    Entered 09/14/16 11:10:32 Page 3 of 17

to the Department that he earned no wages for any week thereafter through the week ending March 19, 2011.[2] *See id.*

On March 20, 2011, Debtor filed a second Unemployment Insurance Claim for Benefits (the "Second Application"). *See* Department's Exhibit 5. In the Second Application, Debtor represented that he worked for Fidelity Employer Services LLC from March 26, 2010 through January 29, 2009; Robert Half International, Inc. from January 3, 2010 through January 4, 2010; and T-Mobile US USA Inc. from January 1, 2010 to January 2, 2010. *See id.* Less than a month after filing the Second Application, the Department contacted Debtor seeking clarification regarding his employment history. *See* Debtor's Exhibit 2. Initially, Debtor responded that he had not worked for Robert Half International, Inc. in over two years and that he had never worked for T-Mobile US. *See id.* Debtor later retracted that statement and asserted that he had forgot that he worked for both employers. *See id.* Debtor further represented that he was then "able and available to accept permanent full-time or part-time work." Debtor represented that he did not work for cash, wages, or anything of value the week he completed the Second Application. *See id.* The week ending March 26, 2011 was a waiting week for which Debtor certified that he earned no wages. *See* Department's Exhibit 6. From the week ending April 3, 2011 through the week ending December 17, 2011, Debtor certified that he earned no wages for any of those weeks. *See id.* On September 26, 2011, the Department sent a Notice of Monetary Determination to Debtor. *See* Debtor's Exhibit 4. The Department informed Debtor that he had "been determined eligible to receive temporary extended unemployment compensation benefits." *Id.* The Department further informed Debtor that "you must however be unemployed thru *[sic]* no fault of your own." *Id.*

---

[2] Debtor made no certification the weeks ending November, 6. 2010, November 13, 2010, November 27, 2010, and December 4, 2010.

- 4 -

In total, Debtor received $23,296.00 in standard unemployment insurance and extended coverage benefits between March 21, 2010 and December 17, 2011.

### C. Debtor's employment history.

Debtor was employed and worked for wages for several weeks during the subject period. From July 13, 2010 through September 8, 2010, Debtor was employed by Robert Half International, Inc. *See* Department's Exhibit 9-A. Debtor eared a total of $3,254.25 in wages during that period. *See id.* From October 4, 2010 through March 19, 2011, Debtor was employed by T-Mobile US. *See* Department's Exhibit 13-B. Debtor earned a total of $10,826.94 in wages during that period. *See id.* From March 21, 2011through December 17, 2011, Debtor was employed by The Kemtah Group. *See* Department's Exhibit 13-C. Debtor earned a total of $23,254.50 in wages during that period. *See id.*

Below is a chart summarizing Debtor's certification and employment history for the relevant period[3]:

| Week End Date | Wages Reported | Employer | Gross Wages Earned | Workers Comp. Benefits Received |
|---|---|---|---|---|
| 3/27/2010 | 500.81 | Fidelity Employer Services LLC | 500.81 | 0.00 |
| 4/3/2010 | 0.00 | | | 0.00 |
| 4/10/2020 | 0.00 | | | 291.00 |
| 4/17/2010 | 0.00 | | | 291.00 |
| 4/24/2010 | 0.00 | | | 291.00 |
| 5/1/2010 | 0.00 | | | 291.00 |
| 5/8/2010 | 0.00 | | | 291.00 |
| 5/15/2010 | 0.00 | | | 291.00 |
| 5/22/2010 | 0.00 | | | 291.00 |
| 5/29/2010 | 0.00 | | | 291.00 |
| 6/5/2010 | 0.00 | | | 291.00 |
| 6/12/2010 | 0.00 | | | 291.00 |
| 6/19/2010 | 0.00 | | | 291.00 |

---

[3] The chart was compiled using Department's Exhibits 6, 8, 9, 13.

| Date | Certification | Employer | Wages | Benefit |
|---|---|---|---|---|
| 6/26/2010 | 0.00 | | | 291.00 |
| 7/3/2010 | 0.00 | | | 291.00 |
| 7/10/2010 | 0.00 | | | 291.00 |
| 7/17/2010 | 0.00 | Robert Half International, Inc. | 406.25 | 291.00 |
| 7/24/2010 | 0.00 | Robert Half International, Inc. | 208.00 | 291.00 |
| 7/31/2010 | 0.00 | Robert Half International, Inc. | 429.00 | 291.00 |
| 8/7/2010 | 0.00 | Robert Half International, Inc. | 440.00 | 291.00 |
| 8/14/2010 | 0.00 | Robert Half International, Inc. | 352.00 | 291.00 |
| 8/21/2010 | 0.00 | Robert Half International, Inc. | 440.00 | 291.00 |
| 8/28/2010 | 0.00 | Robert Half International, Inc. | 352.00 | 291.00 |
| 9/4/2010 | 0.00 | Robert Half International, Inc. | 440.00 | 291.00 |
| 9/11/2010 | 0.00 | Robert Half International, Inc. | 187.00 | 291.00 |
| 9/18/2010 | 0.00 | | | 291.00 |
| 9/25/2010 | 0.00 | | | 291.00 |
| 10/2/2010 | 0.00 | | | 291.00 |
| 10/9/2010 | 0.00 | T-Mobile US[4] | 605.88 | 291.00 |
| 10/16/2010 | 0.00 | T-Mobile US | 605.88 | 291.00 |
| 10/23/2010 | 0.00 | T-Mobile US | 604.25 | 291.00 |
| 10/30/2010 | 0.00 | T-Mobile US | 604.25 | 291.00 |
| 11/6/2010 | No Certification | T-Mobile US | 608.71 | 0.00 |
| 11/13/2010 | No Certification | T-Mobile US | 608.71 | 0.00 |
| 11/20/2010 | 0.00 | T-Mobile US | 712.54 | 291.00 |
| 11/27/2010 | No Certification | T-Mobile US | 712.54 | 0.00 |
| 12/4/2010 | No Certification | T-Mobile US | 667.91 | 0.00 |
| 12/11/2010 | 0.00 | T-Mobile US | 667.91 | 291.00 |
| 12/18/2010 | 0.00 | T-Mobile US | 648.20 | 266.00 |
| 12/25/2010 | 0.00 | T-Mobile US | 648.20 | 266.00 |
| 1/1/2011 | 0.00 | T-Mobile US | 607.40 | 266.00 |
| 1/8/2011 | 0.00 | T-Mobile US | 607.40 | 266.00 |
| 1/15/2011 | 0.00 | T-Mobile US | 561.61 | 266.00 |
| 1/22/2011 | 0.00 | T-Mobile US | 561.61 | 266.00 |
| 1/29/2011 | 0.00 | T-Mobile US | 97.79 | 266.00 |
| 2/5/2011 | 0.00 | T-Mobile US | 0.00 | 266.00 |

---

[4] Department's Exhibit 13-B contains the most detailed information on Debtor's wage earning history with T-Mobile US. It consists of earnings statements showing the amount earned and the number of hours worked, including the number of hours worked overtime, in two-week periods. Nothing in these records identifies how much of the wages were earned in a given single week. For most of the two-week periods, Debtor worked well over 40 hours and received no or very little overtime pay. However, beginning with the two-week period ending February 5, 2011 and continuing through the remainder of Debtor's employment with T-Mobile US the number of hours worked was so low that the Court cannot find that wages were earned in both weeks of the two week period. For two-week periods where the number of non-overtime hours worked were substantially more than 40, the Court finds that Debtor earned wages in both weeks and has split the wages evenly between those weeks. Otherwise, the Court has presumed all wages were earned in the first of the two weeks.

| Date | | Payee | Amount | |
|---|---|---|---|---|
| 2/12/2011 | 0.00 | T-Mobile US | 209.27 | 266.00 |
| 2/19/2011 | 0.00 | T-Mobile US | 0.00 | 266.00 |
| 2/26/2011 | 0.00 | | | 266.00 |
| 3/5/2011 | 0.00 | | | 266.00 |
| 3/12/2011 | 0.00 | T-Mobile US | 390.54 | 266.00 |
| 3/19/2011 | 0.00 | T-Mobile US | 0.00 | 266.00 |
| 3/26/2011 | 0.00 | T-Mobile US | 96.38 | 0.00 |
| | | The Kemtah Group | 600.00 | |
| 4/2/2011 | 0.00 | T-Mobile US | 0.00 | 270.00 |
| | | The Kemtah Group | 420.00 | |
| 4/9/2011 | 0.00 | The Kemtah Group | 555.00 | 270.00 |
| 4/16/2011 | 0.00 | The Kemtah Group | 600.00 | 270.00 |
| 4/23/2011 | 0.00 | The Kemtah Group | 600.00 | 270.00 |
| 4/30/2011 | 0.00 | The Kemtah Group | 600.00 | 270.00 |
| 5/7/2011 | 0.00 | The Kemtah Group | 600.00 | 270.00 |
| 5/14/2011 | 0.00 | The Kemtah Group | 360.00 | 270.00 |
| 5/21/2011 | 0.00 | The Kemtah Group | 600.00 | 270.00 |
| 5/28/2011 | 0.00 | The Kemtah Group | 600.00 | 270.00 |
| 6/4/2011 | 0.00 | The Kemtah Group | 600.00 | 270.00 |
| 6/11/2011 | 0.00 | The Kemtah Group | 397.50 | 270.00 |
| 6/18/2011 | 0.00 | The Kemtah Group | 600.00 | 270.00 |
| 6/25/2011 | 0.00 | The Kemtah Group | 690.00 | 270.00 |
| 7/2/2011 | 0.00 | The Kemtah Group | 600.00 | 270.00 |
| 7/9/2011 | 0.00 | The Kemtah Group | 600.00 | 270.00 |
| 7/16/2011 | 0.00 | The Kemtah Group | 600.00 | 270.00 |
| 7/23/2011 | 0.00 | The Kemtah Group | 600.00 | 270.00 |
| 7/30/2011 | 0.00 | The Kemtah Group | 600.00 | 270.00 |
| 8/6/2011 | 0.00 | The Kemtah Group | 600.00 | 270.00 |
| 8/13/2011 | 0.00 | The Kemtah Group | 600.00 | 270.00 |
| 8/20/2011 | 0.00 | The Kemtah Group | 600.00 | 270.00 |
| 8/27/2011 | 0.00 | The Kemtah Group | 675.00 | 270.00 |
| 9/3/2011 | 0.00 | The Kemtah Group | 675.00 | 270.00 |
| 9/10/2011 | 0.00 | The Kemtah Group | 525.00 | 270.00 |
| 9/17/2011 | 0.00 | The Kemtah Group | 645.00 | 270.00 |
| 9/24/2011 | 0.00 | The Kemtah Group | 592.00 | 270.00 |
| 10/1/2011 | 0.00 | The Kemtah Group | 592.00 | 270.00 |
| 10/8/2011 | 0.00 | The Kemtah Group | 528.00 | 270.00 |
| 10/15/2011 | 0.00 | The Kemtah Group | 640.00 | 270.00 |
| 10/22/2011 | 0.00 | The Kemtah Group | 640.00 | 270.00 |
| 10/29/2011 | 0.00 | The Kemtah Group | 640.00 | 270.00 |
| 11/5/2011 | 0.00 | The Kemtah Group | 656.00 | 270.00 |

| 11/12/2011 | 0.00 | The Kemtah Group | 624.00 | 270.00 |
| 11/19/2011 | 0.00 | The Kemtah Group | 640.00 | 270.00 |
| 11/26/2011 | 0.00 | The Kemtah Group | 880.00 | 270.00 |
| 12/3/2011 | 0.00 | The Kemtah Group | 400.00 | 270.00 |
| 12/10/2011 | 0.00 | The Kemtah Group | 640.00 | 270.00 |
| 12/17/2011 | 0.00 | The Kemtah Group | 640.00 | 270.00 |
| | | Total Benefits received: | | $23,296.00 |

Debtor certified that he earned no wages a total of 87 weeks. The Department paid Debtor either standard unemployment insurance or extended coverage benefits a total of 84 weeks. Debtor earned wages in 65 of the 84 weeks for which he certified that he earned no wages. The Department paid Debtor a total of $17,285.00 in benefits in reliance on those false certifications. Debtor knew that he had worked for wages during each preceding week that he made a false certification. Debtor knew that the Department would rely on his certifications to determine whether and in what amount he was eligible to receive benefits. Based on this, the Court infers that Debtor intended for the Department to rely on his false certifications so that he could obtain benefits he was not eligible to receive. The Court further infers that Debtor intended to deceive the Department into believing that he was eligible to receive benefits. Debtor argues that he believed he was still eligible to receive benefits despite his employment because of letters he received from the Department informing him that he was monetarily eligible to receive benefits. *See* Debtor's Exhibit 4. Debtor's testimony and argument on this issue was not credible. Debtor knew he was required to report all earnings. *See* Department's Exhibit 7. Debtor knew that his eligibility to receive benefits in any particular week depended on whether and how much he earned in wages that week. *See id.* If Debtor honestly believed that he was still eligible for benefits despite earning wages, he would have had no reason to falsely certify that he had earned no wages in those weeks.

For reasons described below, the Court finds that the Department's reliance on Debtor's false representations was justifiable.

### D. *The Department's anti-fraud procedures*

The Department has procedures designed to identify potentially fraudulent claims. Most fraud investigations initiated under these procedures result in a determination that the Department overpaid the subject claimant. One procedure used is to cross match a claimant's certification that he or she did not earn wages for a particular week against employer submitted payroll tax records. Employers must submit quarterly payroll tax records one month after the end of each quarter. *See* 11.3.400.404 NMAC. The cross matching procedure is not fool proof. Occasionally, the Department fails to identify a match between a claimant receiving benefits and a person listed in an employer's records. Additionally, the Department accepts tips from the public regarding potentially fraudulent claims. When the Department uncovers a mismatch between a claimant's certifications and employer records or receives a tip of a potentially fraudulent claim, the Department generates a report. The Department then assigns the report to one of its investigators. Investigators conduct investigations on a first in, first out basis. Several factors influence the delay between report generation and investigation initiation. Some of those factors are staffing, number of claimants, and the number of fraud reports in the que. Currently, the delay is approximately two weeks. In 2010 and 2011, the Department experienced a drastic increase in claims and potential fraud reports. During that time, the delay between report generation and investigation initiation was more than one year. The Department's investigation of reports typically lasts a few months.

An investigator begins an investigation by delivering questionnaires to the claimant's suspected employer(s). The questionnaire requests the claimant's history of employment with that

employer, including dates of employment and wages earned by week. *See* Department's Exhibits 9-A, 9-B, and 9-C. Simultaneously, the investigator delivers a letter to the claimant informing the claimant of the investigation. *See* Department's Exhibit 10. The letter requests that the claimant disclose all employment during the subject period. *See id.* After reviewing this information, the Department makes a determination of whether the claimant received overpayment of unemployment insurance benefits. *See* Department's Exhibit 14. The Department then issues a letter to the claimant informing him or her of the determination. *See id.* The claimant may appeal an unfavorable determination by notifying the Department of a desire to appeal within 15 days of the date the letter was issued. *See id.* An appeal of the determination is heard before an administrative law judge. At the appeal hearing, the claimant is provided an opportunity to make argument and present evidence.

### E. *The Department's investigation of Debtor.*

The Department received four reports identifying Debtor's claims as possibly fraudulent. Three of the reports were generated from third-party tips and one was generated by the Department's cross matching procedure. The Department received the tips in November and December 2011. The Department is uncertain when the cross matching procedure generated a report. Debtor's first stint of employment following his first claim for unemployment insurance benefits began in the third quarter of 2010. Thus, the earliest that the cross matching procedure could have uncovered a match was toward the end of 2010. The Department began its investigation into Debtor's claims in November 2011. The Court infers that the Department's cross matching procedure uncovered Debtor's employment with Robert Half International, Inc. in the third quarter of 2010.[5] The Court further infers that Debtor's claim was placed in the que for

---

[5] The Court makes this inference because: (1) Debtor was employed and earned wages in the third quarter of 2010; (2) Robert Half International, Inc. was obligated to submit payroll tax records for the third quarter of 2010 in late

investigation near the end of 2010.[6] Through its investigation, the Department determined that it had overpaid Debtor $17,285.00 in unemployment insurance benefits. *See* Department's Exhibits 14-A, 14-B, 14-C, and 14-D. The Department sent four letters to Debtor informing him of its determination and of his right to appeal. *See id.* Debtor unsuccessfully appealed the Department's determination. The Department received $1,760.07 from Debtor through tax intercepts.

## III. Discussion.

The Department asserts that (1) Debtor owes the Department $15,584.93[7] based on overpayments of unemployment insurance benefits; and (2) that the debt is non-dischargeable under Section 523(a)(2)(A) because it was obtained by fraud. Debtor asserts that (1) he was misled by the Department's staff into believing he was eligible for unemployment insurance benefits despite his employment; and (2) the Department's reliance on his certifications was not justifiable.

Dischargeability actions require a two-part analysis: first, the bankruptcy court must determine the validity of the debt under applicable law, and second, the bankruptcy court must determine the dischargeability of that debt under § 523.[8] *See In re McKendry*, 40 F.3d 331, 336 (10th Cir. 1994) ("'In bankruptcy court there are two separate and distinct causes of action: One cause of action is on the debt and the other cause of action is on the dischargeability of that debt, a cause of action that arises solely by virtue of the Bankruptcy Code and its discharge provisions.'" (quoting *In re Moran*, 152 B.R. 493, 495 (Bankr. S.D. Ohio 1993)); *In re Thompson*, No. AP 14-

---

October or early November 2010; (3) Plaintiff's cross matching procedure could have uncovered the match any time after Robert Half International, Inc. submitted its payroll tax records for the third quarter of 2010; (4) the then prevailing wait period between report generation and investigation was approximately a year; and (5) Plaintiff initiated its investigation approximately a year after the payroll tax records for the third quarter of 2010 were due.

[6] *See* infra, note 3.
[7] The Department alleges an overpayment of $17,285.00
[8] The Court uses "claim" as synonymous with "cause of action" for purposes of applying § 523(a)(2)(A), consistent with the synonymous nature of those terms under the doctrines of res judicata and claim preclusion.." *Compare* Restatement (First) of Judgments, § 62 (using the term "cause of action") *with* Restatement (Second) of Judgments, § 25 (using the term "claim").

01081, 2016 WL 4413906, at *4 (B.A.P. 10th Cir. Aug. 19, 2016) ("Dischargeability actions require a two-part analysis: first, the bankruptcy court must determine the validity of the debt under applicable law (the claim on the debt); and second, the bankruptcy court must determine the dischargeability of that debt under § 523 (the dischargeability claim)."). *See also Brown v. Felsen*, 442 U.S. 127, 135 (1979) (differentiating between the claim on the debt and the claim on dischargeability of the debt in holding that claim preclusion effect of a state court judgment does not extend to the claim on dischargeability of a debt.).

### A. *Debtor owes a debt of $15,584.93 to the Department.*

The dischargeability analysis begins with determining the validity of the debt. "Debt" is defined in the Code as "liability on a claim," § 101(12), and "claim" is defined in turn as a "right to payment." § 101(5)(A). For purposes of § 523(a)(2)(A), "debt" means liability on "an enforceable obligation." *Cohen v. de la Cruz*, 523 U.S. 213, 213 118 S. Ct. 1212, 1214 (1998) (reaching this conclusion after examining the definition of "debt" under §§ 101(5)(A) and 101(12)). Whether a debt exists is determined by looking to applicable law, frequently state law. To establish the claim on the debt under § 523(a)(2)(A), the claimant must establish that the debtor is liable on an enforceable obligation under applicable non-bankruptcy law, nothing more nor less.

The New Mexico Unemployment Compensation Act requires individuals to forfeit their entire benefit claim if they knowingly increase the amount of their benefits through a false representation. See N.M.S.A.1978 § 51–1–38(F). That section provides:

> Notwithstanding any other provision of the Unemployment Compensation Law, if any individual claiming benefits or waiting period credits, in connection with such claim, makes any false statement or representation, in writing or otherwise, knowing it to be false or knowingly fails to disclose any material fact in order to obtain or increase the amount of a benefit payment, such claim shall not constitute a valid claim for benefits in any amount or for waiting period credits but shall be void and of no effect for all purposes. The entire amount of the benefits obtained by means of such claim shall be, in addition to any other penalties provided herein,

subject to recoupment by deduction from the claimant's future benefits or they may be recovered as provided for the collection of past due contributions in Subsection B of Section 51–1–36 NMSA 1978.[9]

Thus, the Department must establish: (1) Debtor is an individual; (2) Debtor claimed benefits or waiting period credits; (3) Debtor made a false statement or representation or failed to disclose a material fact; (4) Debtor did so knowingly; and (5) Debtor did so to obtain or increase the amount of a benefit payment. *See id.* With respect to the scienter requirement, "[a]n act is done 'knowingly' if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason." *United States v. Fabiano*, 169 F.3d 1299, 1303 (10th Cir. 1999).

The facts found by the Court establish each of the elements of the Department's claim on the debt. Debtor is an individual. Debtor claimed benefits eighty-four times in 2010 and 2011. Sixty-five times during that period Debtor falsely represented to the Department that he earned $0.00 in wages during the preceding week. Debtor was aware of his obligation to report his earnings to the Department. Despite this knowledge, Debtor voluntarily and intentionally falsely represented that he earned nothing in the preceding week. The Court infers that Debtor made the sixty-five false representations to induce the Department into providing him benefits he was not entitled to receive. Sixty-five times the Department did so. Under the New Mexico Unemployment Compensation Act, the Department may recover the "entire amount of benefits obtained" in those sixty-five weeks. The Department paid Debtor $17,285.00 in benefits in reliance on those sixty-five false representations. The Department obtained $1,760.07 from Defendant through tax intercepts. Debtor owes the Department a debt of $15,584.93.

  **B.** ***Debtor's $15,584.93 debt to the Department is nondischargeable under § 523(a)(2)(A).***

---

[9] N.M.S.A. § 51–1–36(B) provides for collection via "civil action in the dame of the division."

- 13 -

Section 523(a)(2)(A) provides that a debtor is not discharged from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by "false pretenses, a false representation, or actual fraud other than a statement respecting the debtor's or an insider's financial condition." To sustain a claim for false representation under § 523(a)(2)(A), the claimant must prove by a preponderance of the evidence that: "[(1) t]he debtor made a false representation; [(2)] the debtor made the representation with the intent to deceive the creditor; [(3)] the creditor relied on the representation; [(4)] the creditor's reliance was [justifiable]; and [(5)] the debtor's representation caused the creditor to sustain a loss." *Fowler Bros v. Young* (*In re Young*), 91 F.3d 1367, 1373 (10th Cir.1996). *Accord In re Sturgeon*, 496 B.R. 215, 223 (B.A.P. 10th Cir. 2013). Intent to deceive can be inferred from the totality of the circumstances. *Copper v. Lemke* (*In re Lemke*), 423 B.R. 917, 922 (10th Cir. BAP 2010) (citing *Young*, 91 F.3d at 1375).

Sixty-five times Debtor falsely represented to the Department that he had not earned wages in the preceding week. The Court infers that Debtor intended to deceive the Department. The Department relied on each of Debtor's sixty-five false representations in paying Debtor benefits he was ineligible to receive. The Department sustained a loss in making those payments.

Determining whether the Department's reliance on Debtor's sixty-five false representations was "justifiable" requires a more nuanced inquiry. "The appropriate standard is not 'reasonableness' in the sense of whether an objectively reasonable person would have relied upon the debtor's false representations. Rather, the inquiry is whether the actual creditor's reliance was 'justifiable' from a subjective standpoint." *In re Riebesell*, 586 F.3d 782, 791 (10th Cir. 2009). "Even under the 'justifiable' test, however, the plaintiff must 'use his senses' and at least make 'a cursory examination or investigation' of the facts of the transaction before entering into it." *Field*,

516 U.S. at 76, 116 S. Ct. at 446, 133 L. Ed. 2d 351. In other words, a creditor's reliance is not justifiable where the creditor "blindly relies" on a misrepresentation that would have been apparent if the creditor had only performed a perfunctory inquiry. As part of the subjective analysis, the court must consider the particularities of the creditor, including its level of sophistication, intelligence, and experience. *See In re Salma*, No. 09-30863 TEC, 2010 WL 4724252, at *3 (Bankr. N.D. Cal. Nov. 15, 2010) ("Justifiable reliance is a subjective test that turns on the qualities and characteristics of the particular plaintiff, including the plaintiff's level of sophistication and intelligence, and the circumstances of the particular case.").[10] In *In re Edgewater Place, Inc.*, the court described a "key difference" between an objective reasonable standard and the subjective justifiable standard as follows: "under the justifiable reliance standard, close attention must be paid to the individual plaintiff's sophistication, experience and competence." *In re Edgewater Place, Inc.*, No. ED CV 98-281 RT, 1999 WL 35136576, at *5 (C.D. Cal. May 18, 1999).

Here, the plaintiff is not an individual but a governmental body. The Department is sophisticated and has significant experience uncovering and examining fraudulent claims. However, these are not the only particularities of the Department relevant to the analysis. The Department was overburdened and not adequately staffed at the time Debtor made his false representations. Those particular circumstances delayed the Department's investigation of Debtor. The delay allowed Debtor to receive much more in benefits than he would have received if the Department had been capable of promptly ferreting out his fraud. The Department did not "blindly rely" on Debtor's false representations. It was, however, incapable of performing more than a perfunctory inquiry at the time it first became aware of the possibility that Debtor was claiming

---

[10] *In re Momoh*, No. 14-00291, 2016 WL 270155, at *4 (Bankr. D.D.C. Jan. 20, 2016), reconsideration denied sub nom. *Momoh*, No. 14-00291, 2016 WL 1417930 (Bankr. D.D.C. Apr. 8, 2016) ("Plaintiff's lack of sophistication is important in determining whether reliance was reliable.")

benefits he was not entitled to receive. The Department cannot react to suspicion of fraud like an ordinary creditor. As a governmental body, the Department is obligated to follow a specific investigation procedure and must provide a claimant with due process before it cuts off benefits to a claimant. *See New Mexico Dep't of Workforce Sols. v. Garduno*, 363 P.3d 1176, 1181 (N.M. Sup. Ct. 2016) ("Because New Mexico's unemployment compensation scheme provides for the payment of unemployment compensation benefits, claimants for such benefits possess a property interest protected by due process." (internal citations omitted)); N.M. Admin. Code § 11.4.5.1 *et seq.* (Administrative regulations governing the investigation and enforcement of potentially fraudulent claims). The Department followed that procedure in this case with the promptness of which it was capable at that time. The Court does not suggest that unjustifiable delay by a governmental body is not possible. The Court merely finds and holds that, applying a subjective analysis, the Department's delay was justifiable and so was its reliance on Debtor's false representations.

For these reasons, the Department has met its burden in showing that Debtor's $15,584.93 debt to the Department is exempted from the discharge under § 523(a)(2)(A).

**IV.     Conclusion.**

Based on the foregoing, the Court will enter a judgment excepting Debtor's $15,584.93 debt to the Department from discharge under 11 U.S.C. § 523(a)(2)(A).

                                                               ROBERT H. JACOBVITZ
                                                               United States Bankruptcy Judge

Date entered on docket: September 14, 2016

Copy to:

David Beebe
5500 Copper Ave. NE Apt. E-34
Albuquerque, NM 87108

Richard Lawrence Branch
New Mexico Dept of Workforce Solutions
P.O. Box 1928 Legal Section
Albuquerque, NM 87103